*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CO-0716

HENRY O. ALLEN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2002-FEL-006601)

(J. Michael Ryan, *Judge*)

(Argued November 20, 2025                    Decided July 30, 2026)

*Paul Maneri*, Public Defender Service, with whom *Jaclyn Frankfurt* and *Alice Wang*, Public Defender Service, were on the briefs, for appellant.

*Chimnomnso N. Kalu*, Assistant United States Attorney, with whom *Jeanine F. Pirro*, United States Attorney, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *Eliot Folsom*, Assistant United States Attorneys, were on the brief, for appellee.

Before DEAHL, HOWARD, and SHANKER, *Associate Judges*.

Opinion for the court by *Associate Judge* DEAHL.

Opinion by *Associate Judge* SHANKER, concurring in part and dissenting in part, at page 37.

DEAHL, *Associate Judge*: Henry Allen was convicted in 2003 of first-degree murder and related offenses. He was sentenced to forty-five years in prison. Twenty years later, Allen moved for compassionate release under D.C. Code § 24-403.04(a). The trial court denied his motion after concluding that he failed to demonstrate "extraordinary and compelling reasons" that would render him eligible for a sentence reduction. D.C. Code § 24-403.04(a)(3).

Allen argues on appeal that the trial court erred in two ways: (1) by concluding that it could not consider evidence of his rehabilitation when evaluating whether he had demonstrated "extraordinary and compelling reasons" that render him eligible for release; and (2) by reviewing the reasons supporting Allen's release piecemeal, and assessing whether any one of them was individually extraordinary and compelling, rather than evaluating whether the factors cleared that bar when viewed collectively. We largely agree with Allen on both counts. We conclude that the trial court erred by categorically excluding evidence of Allen's rehabilitation from its eligibility analysis. And while it is unclear whether the trial court committed the second ascribed error, we agree that the trial court should have considered his relevant circumstances in their totality as well. We therefore vacate the trial court's order and remand for reconsideration of Allen's motion.

## I. Legal Background

The D.C. Council enacted a compassionate release statute in April 2020, prompted by the onset of the COVID-19 pandemic. *See* COVID-19 Response Supplemental Emergency Amendment Act of 2020, D.C. Act 23-286, § 305(b), 67 D.C. Reg. 4178 (Apr. 10, 2020). That temporary legislation was later permanently codified with a few changes, most notably making sentence modifications mandatory rather than discretionary if a movant satisfies the statutory requirements. *See* Omnibus Public Safety and Justice Amendment Act of 2020, D.C. Law 23-274, § 1203(b), 68 D.C. Reg. 1034 (2021); *see also Bailey v. United States*, 251 A.3d 724, 732-33 (D.C. 2021) (per curiam). The current statute provides:

> (a) Notwithstanding any other provision of law, the court shall modify a term of imprisonment imposed upon a defendant if it determines the defendant is not a danger to the safety of any other person or the community, pursuant to the factors to be considered in 18 U.S.C. §§ 3142(g) and 3553(a) and evidence of the defendant's rehabilitation while incarcerated, and:
>
>> (1) The defendant has a terminal illness, which means a disease or condition with an end-of-life trajectory;
>>
>> (2) The defendant is 60 years of age or older and has served at least 20 years in prison; or
>>
>> (3) Other extraordinary and compelling reasons warrant such a modification, including:

(A) A debilitating medical condition involving an incurable illness, or a debilitating injury from which the defendant will not recover;

(B) Elderly age, defined as a defendant who:

(i) Is 60 years of age or older;

(ii) Has served the lesser of 15 years or 75% of the defendant's sentence; and

(iii) Suffers from a chronic or serious medical condition related to the aging process or that causes an acute vulnerability to severe medical complications or death as a result of COVID-19;

(C) Death or incapacitation of the family member caregiver of the defendant's children; or

(D) Incapacitation of a spouse or a domestic partner when the defendant would be the only available caregiver for the spouse or domestic partner.

D.C. Code § 24-403.04(a).

From this text we have distilled two requirements for movants seeking a sentence reduction: (1) non-dangerousness, captured by the statute's opening sentence; and (2) eligibility, captured by the remainder of the statute, *id.* § (a)(1)-(3). *Colbert v. United States*, 310 A.3d 608, 610 (D.C. 2024). This case concerns only the latter eligibility requirement, as nobody challenges the trial court's finding that

Allen has satisfied the non-dangerousness requirement. To be eligible for a sentence reduction, a movant must demonstrate "extraordinary and compelling reasons" warranting a sentence modification. The statute provides two "primary examples" of such extraordinary and compelling reasons in (a)(1)-(2), and it then provides a catch-all provision in (a)(3), covering any other extraordinary and compelling reasons, with four additional "non-exhaustive" and "illustrative" examples provided. *Autrey v. United States*, 264 A.3d 653, 656 (D.C. 2021).

Importantly, this compassionate release statute was "modeled after" and intended to "align" with the federal compassionate release statute. *Bailey*, 251 A.3d at 729-30; *see also* Report on Bill No. 23-127 before the Committee on the Judiciary & Public Safety, Council of the District of Columbia, at 27 (Nov. 23, 2020) (Committee Report). That federal statute allows a district court to reduce a movant's sentence if it finds that "extraordinary and compelling reasons warrant such a reduction" and the reduction is "consistent with applicable policy statements issued by the [United States] Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). As relevant here, the Sentencing Commission's policy statement in place when the D.C. Council enacted the District's statute listed examples of "extraordinary and compelling reasons" that roughly align with the examples in D.C. Code § 24-403.04(a)—serious medical conditions, advanced age plus time served, family circumstances, and any additional "extraordinary and compelling reason other than,

or in combination with," those just listed. *See* U.S. Sent'g Guidelines Manual § 1B1.13 cmt. n.1(A)-(D) (2018).[1] Congress also instructed the Commission that, in formulating the policy statements guiding compassionate release decisions, "[r]ehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason" for release. 28 U.S.C. § 994(t) (emphasis added).

The District's statute is more favorable to movants than its federal counterpart in several ways. For one, the District's statute reduces the age and length of incarceration requirements for categorical eligibility from seventy years old and thirty years served, 18 U.S.C. § 3582(c)(1)(A)(ii), to sixty years old and twenty years served, D.C. Code § 24-403.04(a)(2). It also makes sentence reductions mandatory rather than discretionary if the movant shows he is non-dangerous and eligible for a reduction. *Compare* 18 U.S.C. § 3582(c)(1)(A) ("the court . . . may reduce the term of imprisonment"), *with* D.C. Code § 24-403.04(a) ("the court shall modify a term of imprisonment"). In addition, our statute directs trial courts to consider rehabilitation as part of the non-dangerousness inquiry, whereas the federal analogue

---

[1] The Commission amended the Guidelines in 2023, and "specifically rejected a requirement that 'other reasons' be similar in nature and consequence to the specified reasons" and stated instead that they "need be similar only in gravity." *See* U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, Policy Statements, Official Commentary, and Statutory Index at 10 (effective Nov. 1, 2023), https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_Amendments.pdf; https://perma.cc/YXD8-UHM3.

does not contain that express command. And unlike the federal scheme, our statute does not say that "[r]ehabilitation of the defendant alone" cannot amount to an extraordinary and compelling reason warranting a sentence reduction. *Compare* 28 U.S.C. § 994(t) *with* D.C. Code § 24-403.04(a)(3).

That is just to give the reader some statutory background before we briefly describe the facts relevant here. We will return to the bulk of that background in our legal analysis below.

## II. Factual and Procedural Background

After serving more than twenty years of his forty-five-year sentence, Allen asked that he be released under the District's compassionate release statute in 2023. Allen acknowledged that he did not satisfy either of the statute's categorical eligibility criteria because he did not have a terminal illness and was several years shy of sixty years old. D.C. Code § 24-403.04(a)(1)-(2); *see Autrey*, 264 A.3d at 656. Instead, he relied on the catch-all provision, § 24-403.04(a)(3). He argued that his age (fifty-six at the time), his length of incarceration, his medical conditions, his vulnerability to COVID-19, and his remarkable degree of rehabilitation combined to form "[o]ther extraordinary and compelling reasons" that warranted his release under the catch-all provision. D.C. Code § 24-403.04(a)(3).

To substantiate his extensive rehabilitation, Allen submitted letters from eight men who attested that he often resolved conflicts and served as a mentor in prison, with one of them referring to him as a "shining beacon of hope for redemption." In addition, Allen's supervisor at the National Association for the Advancement of Returning Citizens described his involvement with the organization and wrote that Allen's mentorship "had such an impact on some of our participants that they gave up the street life." "In my unwavering opinion," that supervisor continued, "I strongly believe that without Mr. Allen's involvement with our youth mentorship program, and sharing his inspiring story of redemption and reform, there would be a lot more of our youth incarcerated or deceased." Allen's supervisor further predicted that Allen "would be a great asset to our organization," and indicated the organization would employ him as an "Outreach Specialist" if he were released. Allen presented this as "evidence both of his lack of dangerousness and of the extraordinary and compelling circumstances justifying release."

The trial court held a hearing where Allen expressed remorse for the murder he committed in 2003, recounted his experiences in federal prison, and described his rehabilitation and how he hoped he could use it to help young men in his community. Allen also submitted an affidavit from a registered nurse, who opined that he had seven comorbidities that put him at "more than an above average risk for severe COVID-19 outcomes." The court then heard from a former inmate and a friend of

Allen's who spoke about the violent conditions in prison to provide context for Allen's infractions for possessing a weapon while imprisoned. Finally, the court considered victim-impact statements from the brother, mother, and daughter of the murder victim, all of whom opposed Allen's release.

The trial court denied Allen's compassionate release motion in a written order. Although the court found that Allen was no longer dangerous, it concluded that he failed to demonstrate extraordinary and compelling reasons that would render him eligible for release. On eligibility, the court first found that Allen failed to show an acute vulnerability to severe illness from COVID-19. Then, the court seemed to disagree with Allen's argument that his age and time served should be considered together with other factors for eligibility purposes, reasoning that the statute "sets an explicit age limit for eligibility" at sixty. Finally, the court declined to consider Allen's rehabilitation in its eligibility analysis, concluding that rehabilitation is relevant only "to the question of dangerousness." Allen now appeals.

### III. Analysis

This appeal requires us to address the scope of the eligibility catch-all provision in the District's compassionate release statute. Specifically, we must decide: (a) whether a trial court can consider evidence of rehabilitation when assessing a movant's eligibility under the catch-all; and (b) whether it must engage

in a totality-of-the-circumstances analysis when assessing the factors a movant cites to support their request for release. After examining the District's statute and the federal scheme on which it was modeled, we hold (1) that trial courts are allowed to consider a movant's rehabilitation when assessing their eligibility under the catch-all provision in D.C. Code § 24-403.04(a)(3); and (2) that they must weigh all the relevant factors collectively and in their totality, rather than piecemeal.

We review questions of statutory interpretation de novo. *Aboye v. United States*, 121 A.3d 1245, 1249 (D.C. 2015). Statutory interpretation is "a holistic endeavor" that "must account for a statute's full text, language as well as punctuation, structure, and subject matter." *Autrey*, 264 A.3d at 656 n.5 (quoting *Grayson v. AT&T Corp.*, 15 A.3d 219, 238 (D.C. 2011) (en banc)). "We begin with the plain language of the statute, but if we find ambiguity, 'our task is to search for an interpretation that makes sense of the statute and related laws as a whole,'" turning to legislative history where appropriate "to ensure that our interpretation is consistent with legislative intent." *Aboye*, 121 A.3d at 1249 (quoting *Richardson v. United States*, 927 A.2d 1137, 1139 (D.C. 2007)).

*A. Rehabilitation evidence can contribute to a movant's eligibility*

We first address whether the trial court erred in holding it could not consider Allen's rehabilitation in prison when evaluating whether he was eligible for release

under the catch-all provision in D.C. Code § 24-403.04(a)(3). Both parties agree that trial courts must consider a movant's rehabilitation when evaluating their present or future dangerousness, as the statute is quite clear about that. *Id.* § 24-403.04(a). Allen argues that rehabilitation evidence can also be relevant to the eligibility inquiry, while the government counters that courts are prohibited from considering rehabilitation in that eligibility inquiry and can consider it only in assessing dangerousness. Based on the text, structure, and purpose of the compassionate release statute, Allen has the better of the argument.

We begin by examining the text and purpose of the statute, then we consider the government's counter that only health-related concerns—and the dissent's counter that only "compassion-based" concerns, *post* at 57—can be extraordinary and compelling. We then close by considering the remainder of the arguments for precluding consideration of rehabilitation evidence in the eligibility analysis.

### 1. The plain text and purpose of the statute support Allen's reading

Start with the text. The phrase "extraordinary and compelling reasons" sets the standard for when a movant is eligible for release. That is a broad and indeterminate standard that is not susceptible to any obvious categorical narrowing, beyond that either ordinary or uncompelling reasons will not satisfy it. Such "general words" are "to be accorded their full and fair scope" and are "not to be arbitrarily

limited." *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 101 (2012). Nothing in the statute expressly or implicitly limits what a trial court can consider when deciding what reasons count as extraordinary and compelling. Because there is no textual basis to categorically exclude rehabilitation evidence from the eligibility inquiry, that evidence would seem to be relevant to the inquiry so long as it is indeed "extraordinary and compelling" in nature, either standing alone or in combination with other factors. *Cf. Fernandez v. United States*, 608 U.S. ----, 146 S. Ct. 1292, 1302 (2026) (noting that the federal statute's analogous "extraordinary and compelling reasons" standard is "demanding"). While the statute further provides six examples of the types of circumstances that satisfy the "extraordinary and compelling" standard, we have explained that those examples are "illustrative" and "non-exhaustive." *Autrey*, 264 A.3d at 656.

The purpose behind the catch-all standard supports this plain reading: It was meant to be "flexible" and to afford trial courts "'discretion to review the compelling facts of a case' rather than bind them with rigid criteria." *Id.* (quoting *Page v. United States*, 254 A.3d 1129, 1130 (D.C. 2021)). In recognizing this flexibility, we have held that certain factors not listed in the statutory examples are nonetheless relevant to the eligibility standard. *See Page*, 254 A.3d at 1130 (movant's "likelihood of infection" was relevant because the trial court could consider "any reasonable factor that directly impacts . . . whether an applicant is 'at risk of severe illness or death

from COVID-19'"); *Autrey*, 264 A.3d at 658 (adding "emerging research about 'long COVID,'" "the availability of booster shots," and "the rise of new virus variants" to the list of relevant factors, among others); *see also Colbert*, 310 A.3d at 612 n.1 ("[T]he District's trial courts have generally concluded that[,] under the catchall provision, a D.C. prisoner can demonstrate eligibility for compassionate release by showing that they are at risk for severe illness from COVID-19, regardless of age or time served." (citation omitted)).

The government and our dissenting colleague offer several counterpoints to this straightforward understanding of the statutory text and its underlying purpose, and we turn to those now.

## 2. Extraordinary and compelling reasons are not limited to health-related concerns

The government counters that the catch-all provision renders only "health-related reasons" as potentially extraordinary and compelling, and indeed all three of the cases just cited above concerned such health-related reasons. *Cf. Burke v. Groover, Christie & Merritt, P.C.*, 26 A.3d 292, 302 n.8 (D.C. 2011) (discussing the *noscitur a sociis* canon, or the idea that "a word or phrase is known by the company it keeps"). We see three serious shortcomings with that view, besides the fact that no such limitation can be found in the statutory text itself: (1) some of the illustrative examples of extraordinary and compelling reasons in the catch-all provision are not

directly tied to health-related concerns; (2) even if all of the illustrative examples related to health in some way, there is no indication that the Council meant to set that as an implied limit on the broad "extraordinary and compelling reasons" standard; and (3) courts have long interpreted an identical phrase in the federal statute to encompass rehabilitation evidence, and when the Council enacted the D.C. statute "in the image of the federal statute," Committee Report at 27, it gave no indication that it intended to so dramatically depart from that approach.

First, some of the illustrative examples of extraordinary and compelling reasons have no direct connection to health-related concerns. Subsection 24-403.04(a)(3)(C), for instance, envisions that a movant's release might be warranted to let them care for their children when the children's primary caretaker has died or become incapacitated. There is no requirement that the children be in poor health, nor is there any requirement that the children lack any alternative substitute caretaker or be at risk of maltreatment before a movant might be released under this provision.[2] The provision instead seems predicated on the value of having

---

[2] There is also no requirement that the caretaker be in poor health, as they might be incapacitated via imprisonment, for example. Our dissenting colleague counters that there is "no reasonable reading of 'incapacitation' in this context" that includes "incarceration," given that it is "paired with 'death.'" *Post* at 57. We disagree. The plain statutory concern of (a)(3)(C) is that the movant's children have lost their caregiver, and the movant/parent could step into their shoes to provide that

parents raise their own children, and on keeping families together, rather than on any health-based concern.

Similarly, § 24-403.04(a)(2) requires the movant to have served "at least 20 years in prison" and be "60 years of age or older," but it does not require that the defendant have any health issues or comorbidities that leave them particularly susceptible to COVID-19. This provision thus seems to be at least partially grounded in the view that movants of advanced age who have served decades in prison have often simply aged out of crime, regardless of whether they have any particular health concerns. While being sixty years of age could arguably be viewed as a proxy for one's health or vulnerability to COVID-19, it would be odd to read subsection (a)(2) in that manner, where subsection (a)(3)(B) is likewise limited to those who are sixty years of age or older, but with express requirements that they suffer from serious medical conditions or comorbidities that leave them acutely vulnerable to COVID-19 (albeit with a lesser "time served" requirement). The omission of any

---

care if released. One who is imprisoned is just as incapable of caring for their children as one who is medically incapacitated, so there is no functional reason why (a)(3)(C) would distinguish between the two. Also, the most natural meaning of the word "incapacitation" includes those who are imprisoned, particularly in the context of whether they are incapacitated from acting as a caretaker. *See Rosales-Mireles v. United States*, 585 U.S. 129, 132-33 (2018) (describing "incapacitation" as one of the principal goals of imprisonment); *United States v. Edwards*, 430 A.2d 1321, 1333 (D.C. 1981) (noting that "incapacitat[ion]" is "one of the functions of imprisonment").

similar health-related criteria in § 24-403.04(a)(2) strongly suggests that health concerns were not the principal, and certainly not the sole, driving force of that provision.

Second, and more importantly, even if all of the illustrative examples were health related, that would be no good reason to woodenly impose "health-relatedness" as an implicit limitation on what might qualify as extraordinary and compelling circumstances. *See United States v. Feeney*, 100 F.4th 841, 848 (7th Cir. 2024) (presuming that "general words" are "to be accorded their full and fair scope" and should not be "arbitrarily limited" (quoting Scalia & Garner, *supra*, at 101)); *United States v. Weiss*, 52 F.4th 546, 552 (3d Cir. 2022) (explaining that the "general-terms canon" "holds that general terms should be interpreted generally"). The government and our dissenting colleague both invoke the *noscitur a sociis* and *ejusdem generis* interpretive canons as justifying their more restrictive readings of the statute. But those canons apply only when necessary to resolve statutory ambiguity—they do not create ambiguity where there is none. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) (rejecting the invocation of these canons as an "attempt to create ambiguity where the statute's text and structure suggest none"); *Russell Motor Car Co. v. United States*, 261 U.S. 514, 520 (1923) (explaining that *noscitur a sociis* is a "useful rule of construction, where words are of obscure or doubtful meaning, and then, but only then, its aid may be sought to remove the

obscurity or doubt by reference to the associated words"); *Lucas v. United States*, 305 A.3d 774, 777-78 (D.C. 2023) (declining to apply *noscitur a sociis* where "a plain-meaning approach resolve[d] the meaning of statutory language"). And there simply is no obscurity in the phrase "extraordinary and compelling reasons"—it permits the consideration of factors as broad as the term itself would suggest, and delimits only the gravity of reasons that merit release, not their type.[3]

To illustrate the point, say your spouse sends you to the grocery store to pick up "whatever groceries we need for the week, including lettuce, tomatoes, avocados,

---

[3] Another problem with applying these interpretive canons to the (a)(3) catch-all provision is that they require an "obvious and readily identifiable" category to emerge from the more specific terms before they can limit the general terms, and there is no such category here. Scalia & Garner, *supra*, at 199; *see also Ali*, 552 U.S. at 225 (noting that "no relevant common attribute *immediately appears*" to connect the specific terms so that they could not be read to limit the broader term (emphasis added)). To illustrate the point, just note our dissenting colleague's varying formulations of what he discerns the limiting category to be. At times, he describes it as "health and welfare concerns," *post* at 57, and once he adds "welfare" into the mix it is hard to see how that is any limitation on permissible considerations at all. We fail to see how Allen's ability to help at-risk youth, which is part of his case for extraordinary rehabilitation, does not relate to his community's "welfare." At other points, our colleague identifies the relevant category of permissible considerations as "factors relating to age, infirmity, and family welfare or factors that are similar in kind"—query why community welfare is not similar in kind to family welfare— "matters of mortality and infirmity," "compassion-based" concerns, or "considerations of age, health, and welfare." *Post* at 38, 53, 57, 65. There is no obvious and readily identifiable category that the illustrative examples in § 24-403.04(a) fit neatly within, as our colleague's shifting attempts to articulate one demonstrates.

cucumbers, berries, and apples." While all of the examples provided are of produce, it would be quite bizarre to interpret your spouse's directive as limiting you to purchasing produce only. The directive is far broader than that and extends to all the groceries your family needs, even though the particular examples your spouse gave all happen to be produce. You would naturally understand your spouse to be relying on your discretion and judgment to determine what groceries you need for the week—get milk and eggs if you think you need them, even though they are not produce—while noting several items that are clear necessities and happen to be produce.[4] So too here. Our compassionate release statute gives a sweeping directive to trial courts that all "extraordinary and compelling reasons" can render one eligible for release. Even if (counterfactually) all of the illustrative examples were health related or could be wedged into some broader category that the text does not identify, that would be little reason to treat that as a categorical limitation on what is plainly a capacious statutory directive.

---

[4] Your spouse's only directives are to stick to (1) groceries that are (2) needed. So if you come home with a new car or a pet turtle, then your spouse might be rightly aggrieved that those are not groceries, even if you arguably need them. And if you come home with a gallon jar of pickles despite already having two in the house, your spouse might rightly complain that those were not needed, even though pickles are groceries. The statutory limitation to reasons that are both (1) extraordinary and (2) compelling functions similarly. Those are real and substantive constraints on what reasons might make one eligible for release, but they should not be artificially narrowed to any unstated category even if the illustrative examples all fit into one.

Third, courts have consistently held that, under the analogous federal statute, rehabilitation "may be considered as one factor among several under" the statute's catch-all provision, 18 U.S.C. § 3582(c)(1)(A). *United States v. Davis*, 99 F.4th 647, 659 (4th Cir. 2024) (district court abused its discretion by overlooking movant's evidence of rehabilitation in eligibility analysis); *see also Fernandez*, 146 S. Ct. at 1303 ("Congress has permitted the Sentencing Commission to treat a defendant's rehabilitation as a relevant consideration in granting compassionate release."); *United States v. Duluc-Méndez*, 156 F.4th 55, 61 (1st Cir. 2025) (while 28 U.S.C. § 994(t) indicates that rehabilitation alone is not an extraordinary and compelling reason for release, that limit "does not stop a defendant from combining rehabilitation with other factors to establish an extraordinary and compelling reason"). Courts are of the uniform view that a movant's rehabilitation is a relevant factor in evaluating whether "extraordinary and compelling reasons" warrant a sentence reduction under the federal statute. *See, e.g.*, *United States v. Johnson*, 619 F. Supp. 3d 81, 98 (D.D.C. 2022) (movant's "rehabilitation while incarcerated" was "extremely impressive" and "an important factor" in the eligibility analysis); *United States v. Vargas*, 502 F. Supp. 3d 820, 829 (S.D.N.Y. 2020) ("[W]here the [d]efendant's rehabilitation appears to be dramatic, the Court would be remiss to ignore it entirely" in assessing whether extraordinary and compelling reasons justified release). If the Council intended to depart from that uniform authority, we

expect they would have said so clearly. *See Thomas v. United States*, 650 A.2d 183, 186 (D.C. 1994) (noting the presumption that, "when the Council enacts, in substance, some existing federal statute, it does so, absent an indication to the contrary, together with any known and settled interpretations of the provisions of that statute").

These interpretations of the federal statute are "highly persuasive" because the District's compassionate release statute was "modeled after" the federal analogue and was intended to "'align' with the use of federal compassionate release following the First Step Act of 2018." *Bailey*, 251 A.3d at 729-30 (citations omitted). Case law discussing factors that can be considered "extraordinary and compelling" in the federal scheme is especially persuasive given that our statute is silent on whether rehabilitation is relevant to that inquiry. In *Bailey*, we encountered a similar silence in our statute regarding the movant's burden of proof and proceeded to adopt the "default rule" that applied uniformly in federal court. *See id.* at 729 (adopting the preponderance standard and noting that the Council's "failure to expressly deviate from this default rule here is strong reason to adhere to it"). Here, the default rule in federal court is that rehabilitation evidence can be considered when determining if a movant is eligible for compassionate release. Our statute gives no indication that the Council intended to depart from that uniform authority, or to give the eligibility standard in the D.C. compassionate release statute a narrower scope than its federal

counterpart. As noted, our statute contains no textual limit on factors considered relevant to that standard, besides the requirement that they be "extraordinary and compelling." *See Concepcion v. United States*, 597 U.S. 481, 497 (2022) ("'Drawing meaning from silence is particularly inappropriate' in the sentencing context." (quoting *Kimbrough v. United States*, 552 U.S. 85, 103 (2007))).

### 3. There is no other good reason to prohibit consideration of rehabilitation in the eligibility calculus

The government and our dissenting colleague offer a host of additional arguments for why rehabilitation is not a permissible consideration in the eligibility calculus, regardless of whether the catch-all provision is limited to health-related concerns. None of them is persuasive.

First, both the government and our dissenting colleague argue that we should presume the Council did not want trial courts to consider rehabilitation evidence in the eligibility inquiry because the word "rehabilitation" appears only once in the compassionate release statute—when circumscribing the dangerousness inquiry. To permit trial courts to consider rehabilitation in both inquiries would run contrary to the anti-surplusage canon, in their views, because it would render the reference to rehabilitation in the statute's opening subsection meaningless. *Post* at 49-50 & n.3.

We disagree. For starters, the anti-surplusage canon guards against interpretations that render statutory *language* inoperative; it says nothing about whether the same *evidence* may bear on more than one statutory inquiry. Under our reading, every word in the statute continues to do meaningful work. The word "rehabilitation" in the opening subsection mandates its consideration in the dangerousness inquiry, presumably to avoid trial courts getting overly focused on the heinousness of the movant's underlying offense(s) and ignoring strong evidence of their rehabilitation in that inquiry. So the anti-surplusage critique is an easy one to answer: if you omit the word rehabilitation from the statute's opening section, it would no longer seem to be a mandatory consideration in the dangerousness inquiry. Leaving it in does that work.

Contrary to the government's and our colleague's related arguments about the Council's presumed intent, including a term in one provision does not imply any intent to exclude it from the scope of another when the provisions are as structurally dissimilar as they are here. *See City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435-36 (2002) (presumption of legislative intent from presence and absence of a phrase "grows weaker with each difference in the formulation of the provisions"). The statute's dangerousness subsection directs trial courts to consider an exhaustive and bounded list of factors, to wit, the factors in 18 U.S.C. §§ 3142(g) and 3553(a) plus rehabilitation. D.C. Code § 24-403.04(a); *see also*

*Bailey*, 251 A.3d at 731-32 (noting the "limited" nature of that inquiry). In stark contrast, the subsections that follow list no factors whatsoever that courts must or should consider when assessing eligibility; they simply provide six examples of circumstances that raise "extraordinary and compelling reasons" for release. D.C. Code § 24-403.04(a)(1)-(3). While our dissenting colleague posits that both halves of the statute require consideration of "certain factors," *post* at 48, that is contrary to the statutory text—there is not a single factor that the statute directs trial courts to consider when assessing eligibility. Instead, the six illustrations of extraordinary and compelling reasons in § 24-403.04(a)(1)-(3) are just that—mere illustrations, with no list of any particular factors that should or must be considered by trial courts. That is, determining a movant's eligibility involves a "flexible" standard with six "illustrative examples" and no textual limit on relevant factors. *Autrey*, 264 A.3d at 656.

Pulling back from interpretive canons, it makes sense that rehabilitation would factor into both inquiries. Rehabilitation takes many forms. Some of those forms speak to whether a movant remains dangerous, while others can be extraordinary and compelling reasons supporting their release (with plenty of overlap between the two). *See, e.g.*, *Vargas*, 502 F. Supp. 3d at 829-31 (noting rehabilitation as "one of multiple factors warranting compassionate release" and concluding it was a

"critical" factor in finding movant "likely does not pose a danger to the public").[5]

Some forms of rehabilitation—like alleviating aggression issues or overcoming substance abuse problems that often lead to crime—speak primarily to a movant's lack of future dangerousness. Other forms of rehabilitation, like a movant's exceptional ability to positively impact lives in his community, might say little about their dangerousness but nonetheless be an extraordinary and compelling factor favoring release. This case presents a prime example of the latter type of rehabilitation. Allen's exemplary record of mentoring at-risk youths is not particularly relevant to his own dangerousness; a great mentor might at the same time be quite dangerous. But if, as the evidence suggests, Allen could steer innumerable youths away from a life of crime and keep them out of the morgue if he is released, that sure sounds like an "extraordinary and compelling reason" favoring his release. There is no sound reason why the Council would have wanted

---

[5] The government says we should "not imply an intent to include rehabilitation in the extraordinary-and-compelling-reasons analysis." But we need not discern any specific intent on the Council's part to include rehabilitation in the scope of the catch-all phrase to hold that it is naturally encompassed by that phrase. *Cf. Concepcion*, 597 U.S. at 497 n.5 (the argument that Congress must expressly specify the scope of information a trial court can consider in a sentence modification proceeding "gets it backward").

to discount considerations like that from the eligibility analysis, and no indication in the statutory text, structure, or history that it did in fact do that.[6]

Second, the government highlights that the limitation in 28 U.S.C. § 994(t)—precluding rehabilitation *alone* from amounting to an extraordinary and compelling reason—is omitted from our statutory scheme. That, in its view, bolsters the argument that the Council intentionally excluded rehabilitation from the eligibility inquiry. The premise of this argument is misleading, and the conclusion the government draws from it is backward. Section 994 simply has no analogue in the D.C. Code, as it governs the duties of the federal sentencing commission. The Council did not "omit" the "Rehabilitation . . . alone" language from any companion provision in the D.C. Code, because there simply is none.[7]

---

[6] Our dissenting colleague says this "begs the question," *post* at 50 n.4, when it is instead an appeal to reason. *See Hessey v. D.C. Bd. of Elections & Ethics*, 601 A.2d 3, 16 n.28 (D.C. 1991) ("Courts are to construe statutes in a way which presumes that the legislature has acted logically and reasonably.")

[7] The District has its own sentencing commission, but its duties are substantially narrower than its federal counterpart, and the statutory provisions governing the duties of the respective sentencing commissions bear no resemblance to each other. *Compare* D.C. Code § 3-101 *with* 28 U.S.C. § 994. Unlike the federal sentencing commission, which was tasked with promulgating "applicable policy statements" relevant to what constitutes extraordinary and compelling reasons for compassionate release, our own sentencing commission has no similar role in the compassionate release process.

Putting that point aside, even if (counterfactually) the Council had intentionally omitted the restriction on rehabilitation alone serving as an extraordinary and compelling reason favoring release, the more natural conclusion would be that it did so because rehabilitation alone might in some circumstances be sufficiently extraordinary and compelling to warrant release, in its view.[8] The most unlikely scenario is the one the government posits: That the Council intentionally removed this limitation on the use of rehabilitation as a standalone extraordinary reason in the federal scheme because it wanted to take that limitation even further and preclude rehabilitation from being considered at all. That is not the type of dramatic alteration to the federal scheme that the Council would seek to achieve through an opaque omission of a companion provision rather than with an express limitation on the consideration of rehabilitation evidence. *See Newell-Brinkley v. Walton*, 84 A.3d 53, 58 (D.C. 2014) (explaining that it is "highly unlikely that the Council would have altered preexisting law in so fundamental a way implicitly rather than explicitly").

Third, our interpretation of the catch-all standard does not render it a completely open-ended inquiry as the government and our dissenting colleague

---

[8] We need not and do not decide whether extraordinary rehabilitation alone can satisfy the eligibility requirement, where the only question before us is whether rehabilitation can contribute to an eligibility finding.

contend. Many reasons are simply not "extraordinary and compelling," either standing alone or in combination with other factors, for eligibility purposes. That is the textual restriction—and the only textual restriction—found in the statute. This standard gets its teeth not by limiting the types of considerations relevant to eligibility, but by demanding that the gravity of those considerations be truly extraordinary and compelling. This approach is in line with the most recent amendments to the federal sentencing guidelines, which note that "other reasons" for release need not be "similar in nature and consequence" to the examples of "extraordinary and compelling reasons" so long as they are similar "in gravity." 2023 Amendments to the Sentencing Guidelines, *supra*, at 10. We do not opine on whether Allen's rehabilitation itself should weigh heavily in the eligibility calculus. We hold only that the trial court here erred in concluding that it was categorically barred from considering Allen's rehabilitation in evaluating whether he was eligible for release under D.C. Code § 24-403.04(a)(3).

Fourth, our dissenting colleague attaches some importance to the fact that this is "a *compassionate* release statute," suggesting that the title of § 24-403.04 indicates it is limited to prisoners facing "unusual distressing circumstances." *Post* at 45-46. Statutory titles are a treacherous place to discern statutory meaning, as the Supreme Court has long followed "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Bhd. of R.R. Trainmen v. Balt. &*

*Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947); *Lawson v. FMR LLC*, 571 U.S. 429, 446 (2014) (explaining that titles are "but a short-hand reference to the general subject matter" of statutory provisions). The principal reason for that wise rule is that statutory titles are abridgments, and "matters in the text . . . are frequently unreflected in the headings and titles." *Trainmen*, 331 U.S. at 528. But we will put this point aside, as we agree with the dissent that a provision's title can be some window into the provision's meaning. *See Fernandez*, 146 S. Ct. at 1303 (giving fleeting consideration to the federal "Compassionate Release" statute's heading). It is just a far foggier window than the ones we prefer to look through, looking out upon the text and structure of the statute.

Taking this argument on its terms, the title of § 24-403.04 does not support our dissenting colleague's view. Read the title: "Motions for compassionate release for individuals convicted of felony offenses." You will see no limitation to unusual distressing circumstances. The title itself suggests that the universe of convicted felons might avail themselves of the relief therein.[9] Our dissenting colleague counters that the very notion of *compassionate* release connotes that the movant

---

[9] Interestingly, the statutory text itself is not expressly limited to felons, as the title would suggest. But because the text applies only to those serving "a term of imprisonment," and misdemeanants generally serve any period of incarceration in jail rather than prison, the text seems consistent with the title's limitation to felons.

must be facing some unusual distressing circumstances. But under any ordinary understanding, releasing a non-dangerous inmate before they have served the entirety of their prison term constitutes an act of compassion. The "unusual distressing circumstance" that they are facing, and that might be alleviated as an act of compassion and mercy, is the very fact of their imprisonment despite their non-dangerousness. The compassion inherent in their release was especially salient at the height of the COVID-19 pandemic, when our statute was passed and inmates faced heightened risks of serious infections owing to prison overcrowding.

Our colleague further counters that we have "prove[n] too much" with that understanding, as it would transform our compassionate release statute into "just an early release statute." *Post* at 46 n.2. It *is* an early release statute, albeit one that is applicable only to prisoners who can demonstrate (1) that they are non-dangerous and (2) that "extraordinary and compelling reasons" support their release. Contrary to our colleague's understanding, the Supreme Court has not "rejected" that interpretation of the federal statute but embraced it. It has expressly recognized that consideration of "rehabilitation, and the like"—with "the like" referring to other "personal circumstances"—is "[i]n keeping with the theme of 'compassion'" under the federal statute. *Fernandez*, 146 S. Ct. at 1303.

Fifth, in countering our reliance on the federal scheme, our dissenting colleague argues that *Bailey*'s resort to federal authority was warranted only because our statute was "silent" on the burden of proof, whereas § 24-403.04 "is not similarly silent with respect to what amounts to an extraordinary and compelling reason for relief." *Post* at 66 n.12. But the statute is silent in precisely the sense that matters: it neither includes rehabilitation among, nor excludes it from, the considerations that might contribute to extraordinary and compelling reasons. As we have covered in the first point above, there is no list of permissible or impermissible considerations in the statute's eligibility section. The dissent's contrary view—that the statute has spoken by enumerating examples that do not mention rehabilitation—works only if one first assumes that the illustrative examples exhaust the kinds of reasons the catch-all reaches. That assumes the very conclusion in dispute, and it is contrary to our precedents holding that the examples are "illustrative" and "non-exhaustive." *Autrey*, 264 A.3d at 656.

Where, as here, the Council borrowed the operative "extraordinary and compelling reasons" standard directly from the federal scheme without addressing a question that federal courts had answered uniformly, *Bailey* tells us that federal answer is highly persuasive. 251 A.3d at 729-30. Our colleague's related observation that the D.C. statute "diverges in certain respects appropriate to the District," *post* at 66 (quoting Committee Report at 27), does not suggest otherwise. The divergences

the Council actually adopted—making relief mandatory rather than discretionary, lowering the age and time-served thresholds for categorical eligibility, and requiring (rather than merely permitting) consideration of rehabilitation at the dangerousness stage—all broaden the path to release relative to the federal scheme. It would be passing strange to read a list of release-expanding divergences as licensing a release-narrowing one that appears nowhere in the text.

Sixth, we disagree with our colleague's assertion that the Supreme Court's recent opinions in *Rutherford* and *Fernandez* "directly and unequivocally refute" that extraordinary and compelling reasons "is a broad and indeterminate standard." *Post* at 51. Those cases say no such thing. *Rutherford* held only that sentencing disparities created by the nonretroactivity of the First Step Act were not "especially unusual and convincing," i.e., were not extraordinary or compelling, so that the court was policing only the gravity of reasons that merit release. *Rutherford v. United States*, 608 U.S. ----, 146 S. Ct. 1320, 1330 (2026); *id.* at 1332 (sentencing disparity created by nonretroactivity of First Step Act was the "ordinary sentencing practice" borne of "Congress's deliberate choice" so that it was "neither an 'extraordinary' nor a 'compelling' reason that warrants" a sentence reduction). And *Fernandez* held that the compassionate release statute could not be used to bypass federal habeas proceedings when the movant seeks to challenge the validity of his underlying

conviction. *See* 146 S. Ct. at 1307 ("[Section] 3582 does not provide that kind of shortcut.").

Those cases precluded consideration of certain systemic or legal claims in the eligibility calculus—to wit, sentencing disparities that were perfectly ordinary because they reflected a deliberate congressional choice, and challenges to conviction validity that would bypass habeas. But they put no similar restrictions on considering the "personal circumstances" of the inmate. *Id.* at 1304. They instead described such "personal circumstances" as within the "heartland" of proper considerations, and rehabilitation is a paradigmatic personal circumstance. *Id. Fernandez* settles the point in our favor, when it observes that "a defendant's rehabilitation" is relevant to whether "extraordinary and compelling" reasons counsel in favor of a movant's release under the federal statute. *Id.* at 1303; *see also post* at 68 (consideration of "rehabilitation, and the like" in the eligibility calculus is "in accordance with the [federal] statute's 'theme of compassion'" (quoting *Fernandez*, 146 S. Ct. at 1302-04)). We are simply following the Supreme Court's lead in interpreting our analogous statute consistent with how it has interpreted the federal statute.

Seventh, our dissenting colleague posits that we have "disregard[ed] the District statute's pandemic origins," and he finds "any substantial discussion of the

legislative history" to be "conspicuously absent" from our analysis. *Post* at 59, 65. But our colleague's more extensive discussion of legislative history shows only that the COVID-19 pandemic animated the passage of our compassionate release statute, which is an undebatable historical point that lends no support to his interpretation. Despite those origins, only one of the six illustrative examples of extraordinary and compelling reasons requires any direct connection to COVID-19, either on the movant's part or anybody else's. *See* D.C. Code § 24-403.04(a)(3)(B)(iii). That is because one animating purpose of the compassionate release statute was to reduce overcrowding in prisons overall, a goal that can obviously be advanced through the release of some subset of particularly deserving non-dangerous inmates irrespective of their particular health conditions or susceptibility to COVID-19. *See* D.C. Council, Twenty-Seventh Legislative Meeting at 1:28:45-1:28:50 (Apr. 7, 2020) (statement of Councilmember Kenyan McDuffie) ("[W]e know what happens when you have density, when people are living on top of one another basically."); Letter from ACLU of the District of Columbia et al. to Muriel Bowser & Phil Mendelson, et al. (Mar. 26, 2020), www.washlaw.org/wp-content/uploads/2020/03/COVID-FINAL-LETTER.pdf; https://perma.cc/9W28-STBK ("It is therefore imperative that [jail and prison] populations be decreased immediately and significantly."). Indeed, in the same legislation, the Council liberalized the accumulation of good time credits to help reduce the overall number of inmates with no regard to whether

they were particularly susceptible to COVID-19 or any other health-related malady. *See* D.C. Act 23-568 § 1201-03, 68 D.C. Reg. 1058-59 (Jan. 22, 2021).

The legislative history, like the statutory text itself, supports our view that extraordinary and compelling reasons is a broad standard that includes consideration of rehabilitation evidence and cannot be artificially narrowed to a movant's particular health-related concerns.

*B. Eligibility depends upon all relevant circumstances assessed collectively*

Allen also argues that the trial court erred by failing to consider the factors supporting eligibility in their totality. It is unclear to us on the present record whether the trial court adopted a "totality of the circumstances" approach when evaluating Allen's eligibility for relief—a point the parties before us have had a spirited debate about. Regardless, because this issue might arise again on remand, we clarify that the trial court should consider all of Allen's circumstances in their totality when evaluating whether he is eligible for a reduced sentence under D.C. Code § 24-403.04(a)(3).

Although we have never explicitly said trial courts should take a "totality of the circumstances" approach when evaluating if the movant provided "extraordinary and compelling reasons" for relief, our case law reflects that the Council "intended

for the catch-all to afford trial courts the 'discretion to review the compelling facts of a case' rather than bind them with rigid criteria." *Autrey*, 264 A.3d at 656 (quoting *Page*, 254 A.3d at 1130). Interpretations of the federal compassionate release statute are also highly persuasive in defining the proper approach to the eligibility inquiry because, as with the proper scope of the catch-all standard, the District's statute is silent on how the factors a movant cites to support their eligibility should be evaluated. *Bailey*, 251 A.3d at 729-30.

Courts interpreting the federal compassionate release statute generally agree that a trial court must consider the "totality of the circumstances" when a movant argues that the combination of multiple factors should satisfy the extraordinary and compelling reasons standard. *See Davis*, 99 F.4th at 655 (eligibility inquiry is "multifaceted and must account for the totality of relevant circumstances" (quoting *United States v. Bethea*, 54 F.4th 826, 832 (4th Cir. 2022))); *United States v. Vaughn*, 62 F.4th 1071, 1072-73 (7th Cir. 2023) (noting general rule that "evidence should *not* be compartmentalized" and adopting the "totality-of-the-circumstances test" that precludes a "divide-and-conquer analysis" (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 60-61 (2018))); *see also Duluc-Méndez*, 156 F.4th at 62 (remanding because trial court "overlooked the [movant's] combination argument or believed that it was unavailable as a matter of law"); *United States v. Trenkler*, 47 F.4th 42,

50 (1st Cir. 2022) (requiring a "holistic approach" and a "review of the [movant's] individual circumstances overall").[10]

We agree with the weight of federal authority and hold that trial courts must consider the totality of a movant's circumstances when evaluating whether they are eligible for a reduced sentence under the District's compassionate release statute, at least when the movant argues that multiple factors should be weighed together. That conclusion is supported by the text of our statute, which references "extraordinary and compelling reasons" in the plural, *see* D.C. Code § 24-403.04(a)(3), rather than an extraordinary and compelling reason in the singular. The trial court of course has discretion to give any particular factor little to no weight in its overall analysis. But the trial court must consider whether "the reasons proposed are, in the aggregate, extraordinary and compelling," even if the individual factors "might not do the trick on their own." *Trenkler*, 47 F.4th at 49.

---

[10] Only the Sixth Circuit has held otherwise. *See United States v. McKinnie*, 24 F.4th 583, 588 (6th Cir. 2022) ("[W]hy would combining unrelated factors, each individually insufficient to justify a sentence reduction, amount to more than the sum of their individual parts?"); *but see Vaughn*, 62 F.4th at 1072-73 (rejecting Sixth Circuit's approach because "the whole is often greater than the sum of its parts" (quoting *Wesby*, 583 U.S. at 60-61)).

## IV. Conclusion

For the foregoing reasons, we vacate the trial court's order and remand for further proceedings consistent with this opinion.

*So ordered.*

SHANKER, *Associate Judge*, concurring in part and dissenting in part: Henry O. Allen was convicted in 2003 of multiple offenses, including first-degree murder while armed, related to the killing of Maurice Rogers. He was sentenced to an aggregate term of forty-five years of imprisonment to be followed by five years of supervised release. In 2023, Mr. Allen moved for a sentence reduction under the District of Columbia's compassionate release statute. *See* D.C. Code § 24-403.04(a)(3). The statute provides that a court "shall modify a term of imprisonment" if a prisoner can satisfy two core requirements by a preponderance of the evidence: (1) that they are no longer dangerous and (2) that they are eligible for release. *Id*. § 24-403.04(a), (a)(3); *see Colbert v. United States*, 310 A.3d 608, 611 (D.C. 2024).

The trial court denied Mr. Allen's motion, concluding that he proved that he is no longer dangerous but he failed to demonstrate his eligibility for early release. Finding that Mr. Allen had failed to satisfy any of the statute's per se criteria for

eligibility, the trial court considered the statute's "catch-all" provision, which requires a movant to show "[o]ther extraordinary and compelling reasons" warranting a sentence modification. Although it is not entirely clear, the court arguably failed to adopt a "totality of the circumstances" approach when evaluating Mr. Allen's eligibility for relief under the catch-all. The court also categorically rejected Mr. Allen's assertion that his rehabilitation and positive influence on others could be considered under the eligibility analysis as extraordinary and compelling reasons for release, concluding that rehabilitation is, as a matter of law, "relevant" only "to the question of dangerousness" and that Mr. Allen's position has "little textual or precedential support."

I agree with the majority that trial courts must consider the totality of a movant's circumstances when evaluating their eligibility for a reduced sentence under the District's compassionate release statute, and I therefore join that portion of the majority opinion. I respectfully dissent, however, from the majority's conclusion that trial courts can consider a movant's rehabilitation when assessing their eligibility under the catch-all provision, D.C. Code § 24-403.04(a)(3). In my view, the statutory text and structure and the legislative history compel the opposite conclusion: a compassionate release movant must establish eligibility by way of one or more of the enumerated factors relating to age, infirmity, and family welfare or factors that are similar in kind. Rehabilitation while incarcerated is relevant under

the statute—and Mr. Allen's impressive efforts in that regard cannot be gainsaid—but only in determining whether an *eligible* movant is not a danger to the safety of any other person or the community. The majority's contrary reading contravenes fundamental principles of statutory interpretation and the clear import of legislative history and converts D.C. Code § 24-403.04 into a general early release statute, a far cry from the statute the Council enacted in response to the public health crisis wrought by COVID-19.

## I. Legal Background

In the spring of 2020, as part of the Omnibus Public Safety and Justice Amendment Act of 2020 and in response to the COVID-19 pandemic, the D.C. Council enacted a local compassionate release statute "in the image of" a federal counterpart statute. Report on Bill 23-0127 Before the Committee on the Judiciary & Public Safety, Council of the District of Columbia, at 27 (Nov. 23, 2020) ("Committee Report").

The statute provides, in relevant part:

> (a) Notwithstanding any other provision of law, the court shall modify a term of imprisonment imposed upon a defendant if it determines the defendant is not a danger to the safety of any other person or the community, pursuant to the factors to be considered in 18 U.S.C. §§ 3142(g) and

3553(a) and evidence of the defendant's rehabilitation while incarcerated, and:

(1) The defendant has a terminal illness, which means a disease or condition with an end-of-life trajectory;

(2) The defendant is 60 years of age or older and has served at least 20 years in prison; or

(3) Other extraordinary and compelling reasons warrant such a modification, including:

(A) A debilitating medical condition involving an incurable illness, or a debilitating injury from which the defendant will not recover;

(B) Elderly age, defined as a defendant who:

(i) Is 60 years of age or older;

(ii) Has served the lesser of 15 years or 75% of the defendant's sentence; and

(iii) Suffers from a chronic or serious medical condition related to the aging process or that causes an acute vulnerability to severe medical complications or death as a result of COVID-19;

(C) Death or incapacitation of the family member caregiver of the defendant's children; or

> (D) Incapacitation of a spouse or a domestic partner when the defendant would be the only available caregiver for the spouse or domestic partner.

D.C. Code § 24-403.04(a).

Although the statute is oddly structured and does not use the term "eligible," we have described the factors set forth in Section 24-403.04(a)(1)-(3) as the "eligibility" prong, with Section 24-403.04(a) constituting the "dangerousness" prong. *See Stringer v. United States*, 317 A.3d 875, 877 (D.C. 2024); *Colbert*, 310 A.3d at 611-14. Because a movant must satisfy both prongs to obtain relief, *see Autrey v. United States*, 264 A.3d 653, 654 (D.C. 2021), it does not matter which one is analyzed first, but the eligibility prong is a sort of threshold inquiry relating to the class of persons who can be considered for a sentence modification, while the dangerousness analysis informs whether an eligible movant can be safely released into the community. *See Colbert*, 310 A.3d at 612-14 (addressing eligibility first and then addressing whether the movant met "his burden to show he would not be a danger if released"); *Bailey v. United States*, 251 A.3d 724, 728 (D.C. 2021) (per curiam) (noting that a prisoner can obtain relief if "they meet certain eligibility criteria" and the trial court determines that they are not dangerous).

To obtain relief under the statute, the movant bears the burden to prove by a preponderance of the evidence both that they are eligible and that they are

nondangerous. *Colbert*, 310 A.3d at 611. To satisfy their burden under the eligibility prong, a movant can show either that they meet one of the statute's two per se criteria set out in Section 24-403.04(a)(1) (terminal illness) and (a)(2) (age plus length of imprisonment) or that they qualify under Section 24-403.04(a)(3)'s catch-all provision because an "[o]ther extraordinary and compelling" reason warrants a sentence reduction. The statute sets forth four examples of extraordinary and compelling reasons: (1) a debilitating illness or injury, (2) old age plus vulnerability to severe medical complications or death from COVID-19, (3) death or incapacitation of the family member caregiver of the defendant's children; or (4) incapacitation of a spouse or domestic partner when the defendant would be that person's only available caregiver.

The federal scheme for compassionate release, which served as the "image" for the District's scheme but is phrased differently, rests on a three-legged stool. The first leg, 18 U.S.C. § 3582(c)(1)(A), provides for reduction of prison terms for movants who meet age and length-of-imprisonment criteria or who can demonstrate "extraordinary and compelling reasons" that warrant early release. Such a sentence reduction must be "consistent with applicable policy statements issued by the [United States] Sentencing Commission." *Id.* The second leg, 28 U.S.C. § 994(t), instructs the Commission to promulgate policy statements "describ[ing] what should be considered extraordinary and compelling reasons for sentence reduction,

including the criteria to be applied and a list of specific examples." Congress limited the Commission in one way: by mandating that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." *Id.*

The envisioned policy statement—the third leg of the stool—is contained in the United States Sentencing Guidelines. In substantive terms, it provides that a court may grant compassionate release "after considering the applicable factors listed at 18 U.S.C. § 3553(a), only when it finds both that 'extraordinary and compelling reasons warrant the reduction,' and that 'the defendant is not a danger to the safety of any other person or to the community.'" *United States v. Long*, 997 F.3d 342, 349 (D.C. Cir. 2021) (quoting U.S. Sent'g Guidelines Manual § 1B1.13(1)(A), 1B1.13(2) (U.S. Sent'g Comm'n 2018)). At the time D.C. Code § 24-403.04 was enacted, the Guidelines contained two commentary notes relevant here.[1] First, note one outlined four categories of "extraordinary and compelling reasons" for relief: medical conditions, age, extenuating family circumstances, and a catch-all covering reasons "other than, or in combination with," the enumerated reasons. U.S. Sent'g Guidelines Manual § 1B1.13 cmt. n.1(A)-(D). Second, note three incorporated

---

[1] The Commission amended the Guidelines in 2023, including by moving key provisions from the commentary to the Guidelines themselves. *See* U.S. Sent'g Guidelines Manual app. C (effective Nov. 1, 2023). Unless otherwise noted, references to the Guidelines refer to the 2018 Guidelines, which were in effect at the time D.C. Code § 24-403.04 was enacted.

Congress's mandate that rehabilitation alone is not an extraordinary or compelling reason for a sentence reduction. *See id.* § 1B1.13 cmt. n.3.

## II. Analysis

In my view, the statutory text and structure and the legislative history of the District's compassionate release law, taken together, confirm that rehabilitation is not an appropriate consideration under the eligibility prong of the compassionate release inquiry.

## A. Statutory Text and Structure

I begin with the statutory language and framework. Because statutory interpretation is a "holistic endeavor," this court "consider[s] not only the bare meaning of the word but also its placement and purpose in the statutory scheme." *In re Macklin*, 286 A.3d 547, 553 (D.C. 2022).

Let's start with the big picture. Section 24-403.04 is, by its terms, a *compassionate* release statute—not a general parole or early release statute based on rehabilitation or good behavior, *see* D.C. Code §§ 24-404 (parole) & 24-403.01b (time credits for participation in recidivism reduction programming or productive activities), or an incarceration reduction statute, *see id.* § 24-403.03 ("Modification of an imposed term of imprisonment for violations of law committed before 25 years of age."). *See Mitchell v. United States*, 64 A.3d 154, 156 (D.C. 2013) (stating that,

although the significance of the title of a statute "should not be exaggerated," "it may be a useful aid in resolving an ambiguity in the statutory language," and, "in determining the extent and reach of an act of the legislature, the court should consider not only the statutory language, but also the title" (citation modified)); *see also Fernandez v. United States*, 146 S. Ct. 1292, 1303 (2026) ("The name for § 3582(c)(1)(A)—'Compassionate Release'—highlights its focus on granting mercy rather than righting legal wrongs."). "Compassion" means "sympathetic consciousness of others' distress together with a desire to alleviate it," *Compassion*, Merriam-Webster, https://www.merriam-webster.com/dictionary/compassion; https://perma.cc/NX3E-T22K (last visited June 26, 2026); "compassionate" means "having or showing compassion" and "granted because of unusual distressing circumstances affecting an individual," *Compassionate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/compassionate; https://perma.cc/PKN7-DK3T (last visited June 26, 2026). Notably, the definition of "compassionate" states that it is commonly used in connection with military privileges and provides the following example: "The soldier was granted *compassionate* leave following the death of his father." *Id.*; *see Lucas v. United States*, 305 A.3d 774, 777 (D.C. 2023) ("When the statute does not define the term in question, it is appropriate for us to look to dictionary definitions to determine its ordinary meaning." (citation modified)). Thus, in light of its title and the other

statutes that surround it in the Code, Section 24-403.04 applies to a class of prisoners—those whose release might be warranted based on mercy due to unusual distressing circumstances—and not all prisoners who can show rehabilitation. *See Fernandez*, 146 S. Ct. at 1304 (describing the "heartland 'extraordinary and compelling reasons' that might warrant an early release from prison" as "age, illness, a child left with no guardian").[2]

Turning to the operative language of the statute, the word "rehabilitation" appears just once, as part of the dangerousness analysis: to establish nondangerousness, a movant must show that they are "not a danger to the safety of any other person or the community based on factors from 18 U.S.C. §§ 3142(g) and 3553(a) and evidence of the defendant's rehabilitation while incarcerated." D.C. Code § 24-403.04(a). The factors that follow, which we have labeled the "eligibility"

---

[2] The majority asserts that "statutory titles are a treacherous place to discern statutory meaning," *ante* at 27, but the Supreme Court "has long considered that the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." *Dubin v. United States*, 599 U.S. 110, 120-21 (2023) (citation modified). More to the point, the Supreme Court looked to the statutory title to discern statutory meaning *in this very context* in *Fernandez*. And the majority's claim that "releasing a non-dangerous inmate before they have served the entirety of their prison term constitutes an act of compassion," *ante* at 29, proves too much: under that view, a compassionate release statute is just an early release statute, an interpretation that the Supreme Court specifically rejected.

factors, *see Colbert*, 310 A.3d at 612, make no mention of rehabilitation and instead all relate to conditions or circumstances that might call for mercy.

The explicit inclusion of rehabilitation in the dangerousness analysis makes its exclusion from the eligibility analysis meaningful. Although they are intertwined, eligibility and dangerousness are distinct considerations—one going to the class of persons covered by the statute's scope and the other going to whether a person in that class should be awarded relief—and we generally presume that when a legislature "includes particular language in one section of a statute but omits it in another section of the same [legislation]," it did so "intentionally and purposefully." *Doe v. Burke*, 133 A.3d 569, 574 (D.C. 2016) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). *See Rutherford v. United States*, 146 S. Ct. 1320, 1333 (2026) (stating that the eligibility prong of the federal compassionate release statute is a "gatekeeping requirement" and not a "free-for-all"; "It is a distinct analytical step that imposes independent and ascertainable limits on access to compassionate release."). The Council's decision to include rehabilitation in the dangerousness analysis is logical: rehabilitation speaks to whether a movant who is eligible as a threshold matter will not be a danger if released, and it functions as a counterbalance to factors that would likely counsel against a modified sentence, such as the nature of the offense, the weight of inculpatory evidence, and the defendant's criminal

history and character. *See* D.C. Code § 24-403.04(a) (citing 18 U.S.C. §§ 3142(g) and 3553(a)).

The logical conclusion to draw from rehabilitation's omission from the eligibility analysis is that the Council did not consider rehabilitation to also be relevant to the determination whether a movant is within the class of persons covered by the statute. Had the Council intended to extend consideration of rehabilitation to the eligibility analysis, it presumably would have said so; we cannot read rehabilitation into the eligibility analysis by attributing this clear "omission" to a "simple mistake in draftsmanship." *See Burke*, 133 A.3d at 574; *see also Holiday v. United States*, 683 A.2d 61, 90 (D.C. 1996) ("[I]t is this court's role to apply laws as the Council has written them, not as we would have had the Council write them, or have written them ourselves, in hindsight.").

My colleagues discard this presumption of intentional omission on the ground that the dangerousness and eligibility inquiries are "structurally dissimilar." *Ante* at 22-23. *See City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435-36 (2002) (stating that the presumption of legislative intent from the presence or absence of a phrase "grows weaker with each difference in the formulation of the provisions"). I see no material dissimilarity. Section 24-403.04 is a short, contained statute, providing for a determination of dangerousness based on certain factors,

including rehabilitation, and eligibility based on other factors, with no reference to rehabilitation. *See United States v. Granderson*, 511 U.S. 39, 63 (1994) (Kennedy, J., concurring) ("The presumption loses some of its force when the sections in question are dissimilar and scattered at distant points of a lengthy and complex enactment. But [in cases where the legislature] enacted both provisions in the same section of the same [a]ct, the presumption is strong."). The dangerousness and eligibility analyses are two halves of a single statutory provision setting out what a movant must show to obtain relief, hardly the sort of dissimilar and scattered provisions that would create doubt about the Council's intent. *See id.*; *see also Reichert v. Kellogg Co.*, 170 F.4th 473, 486 (6th Cir. 2026) ("[T]his presumption does not apply when the sections are dissimilar, with different language and different formulations addressing different circumstances." (citing *City of Columbus*, 536 U.S. at 435-36)).

The majority's view that rehabilitation can be considered as part of the eligibility analysis also renders its role in the dangerousness analysis redundant. Even if a court weighs rehabilitation differently in each analysis, it is still considering and crediting the same evidence twice for ultimately the same purpose:

granting compassionate release.[3] Put simply, a prisoner could show that they are eligible for release because they are rehabilitated and that they deserve release because they are rehabilitated. If that were the Council's intent, it seems like it would have enacted a statute simply permitting trial courts to grant sentence modifications to rehabilitated (nondangerous) prisoners. Because we avoid interpretations that render parts of a statute surplusage, I cannot embrace the majority's view. *See Flowers v. District of Columbia*, 343 A.3d 46, 52 (D.C. 2025) ("We generally adhere to the canon of statutory construction under which 'each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous.'" (quoting *Thomas v. District of Columbia Dep't of Emp. Servs.*, 547 A.2d 1034, 1037 (D.C. 1988))).[4]

My conclusion is not at odds with the fact that the list of "extraordinary and compelling reasons" in Section 24-403.04(a)(3) is neither exhaustive nor exclusive.

---

[3] Contrary to the majority's critique, *ante* at 21-22, my point is not that the anti-surplusage canon means that the same evidence may not bear on more than one statutory inquiry; it is that the *reason* rehabilitation is not in the eligibility portion of the statute is that its inclusion would result in the double-counting of a factor already accounted for.

[4] The majority's assertion that rehabilitation is relevant to eligibility because it can relate to a movant's "exceptional ability to positively impact lives in his community," *ante* at 24, begs the question: contributions to the community might be relevant to rehabilitation, but the very issue before us is whether the statute contemplates that contributions to the community (and other aspects of rehabilitation) are properly considered as part of a movant's eligibility for release.

*Ante* at 12-13, 30-31. *See Autrey*, 264 A.3d at 656; *see also Aboye v. United States*, 121 A.3d 1245, 1249 & n.10 (D.C. 2015) (explaining that "the participle *including* typically indicates a partial list" (citation modified)) (citing *Fed. Land Bank v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle.")). While flexible, the catch-all is not so broad as to render Section 24-403.04 a generic release statute: its coverage is thematically bound by its context and surrounding language. *See In re Macklin*, 286 A.3d at 553 ("[W]e do not read statutory words [or phrases] in isolation; the language of surrounding and related paragraphs may be instrumental to understanding them." (quoting *Tippett v. Daly*, 10 A.3d 1123, 1127 (D.C. 2010) (en banc))). Indeed, the Supreme Court's recent decisions in *Rutherford* and *Fernandez* directly and unequivocally refute the majority's assertion that "extraordinary and compelling" "is a broad and indeterminate standard that is not susceptible to any obvious categorical narrowing." *Ante* at 11. *See Rutherford*, 146 S. Ct. at 1332 ("While the terms 'extraordinary' and 'compelling' leave room for judgment, they are not so flexible as to encompass any consideration. Their meaning depends on context: A reason is 'extraordinary' and 'compelling' only if it is sufficiently unusual and convincing to 'warrant' compassionate release."); *Fernandez*, 146 S. Ct. at 1302 ("extraordinary and

compelling reasons" is a "demanding standard" and the "criteria are not empty vessels").[5]

Canons of statutory interpretation are informative here.[6] Working in tandem, two canons predominantly govern my approach: *noscitur a sociis* and *ejusdem generis*.

"The maxim *noscitur a sociis*, that a word or phrase is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word or phrase is capable of many meanings in order to avoid the giving of unintended breadth." *Burke v. Groover, Christie & Merritt, P.C.*, 26 A.3d 292, 302 n.8 (D.C. 2011) (citation modified). Here, the phrase "other extraordinary and compelling reasons" is in the company of reasons relating to advanced age, illness, and death or incapacitation impacting caregiving capabilities, either of the movant or of a close

---

[5] In response to my point that *Fernandez* and *Rutherford* establish that "extraordinary and compelling" is not an unbounded phrase, the majority says that those cases "say no such thing." *Ante* at 31. That is a curious assertion, as they literally say that very thing. *See Rutherford*, 146 S. Ct. at 1332 ("not so flexible as to encompass any consideration"); *Fernandez*, 146 S. Ct. at 1302 ("not empty vessels").

[6] While "canons of construction are not technical rules of law which afford the answer to a problem" of statutory interpretation, they nonetheless "provide some guidance." *See District of Columbia v. Jerry M.*, 717 A.2d 866, 871 (D.C. 1998).

family member—that is, reasons relating to unusual distressing circumstances.[7] The statute contemplates matters of mortality and infirmity as the bases for compassionate release eligibility, supporting the conclusion that the appropriate interpretation of "other extraordinary and compelling reasons" is likewise thematically limited. *See Fernandez*, 146 S. Ct. at 1298 (observing that "extraordinary and compelling reasons" in the federal statute relate most commonly to "conditions like the prisoner's age and infirmity"); *Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.").

As with *noscitur a sociis*, courts invoke *ejusdem generis* to interpret words in a series. But while *noscitur a sociis* focuses on how to interpret a specific term in the series, *ejusdem generis* is more narrowly focused on how to interpret a residual or catch-all phrase. *See Yates v. United States*, 574 U.S. 528, 549-50 (2015) (Alito, J., concurring) ("The *noscitur a sociis* canon instructs that when a statute contains a list, each word in that list presumptively has a 'similar' meaning. A related canon,

---

[7] *See* D.C. Code §§ 24-403.04(a)(1) (terminal illness), 24-403.04(2) (advanced age and minimum time served requirement), 24-403.04(3)(A) (debilitating medical condition or injury), 24-403.04(3)(B) (advanced age in combination with minimum time served requirement and a chronic or serious medical condition), 24-403.04(3)(C) (death or incapacitation of children's caregiver), 24-403.04(3)(D) (incapacitation of spouse or domestic partner where movant is only possible caregiver).

*ejusdem generis* teaches that general words following a list of specific words should usually be read in light of those specific words to mean something similar." (internal citation omitted)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 169 (2012) (explaining that *ejusdem generis* "applies when a drafter has tacked on a catchall phrase at the end of an enumeration of specifics").

When faced with a catch-all provision, courts "afford [the] statute the scope a reasonable reader would attribute to it," which is "not necessarily [ ] the broadest possible construction it can bear." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 217-18 (2024).[8] Accordingly, catch-all clauses are to be read "as bringing within a statute categories similar in type to those specifically enumerated." *EPA v. Calumet Shreveport Refin., L.L.C.*, 605 U.S. 627, 639 (2025). This maxim applies whether the enumerated examples precede or follow the general term, or where, as here, both are true. *See* 2A Norman Singer & Shambie Singer, *Sutherland Statutes and Statutory Construction* § 47.17 (7th ed. 2025) (whether "general words follow specific words" or "specific words follow[ ] general ones," the canon of *ejusdem*

---

[8] *See also* Scalia & Garner, *supra*, at 169-70 (explaining the rationale for the *ejusdem generis* canon as twofold: (1) "[w]hen the initial terms all belong to an obvious and readily identifiable genus, one presumes that the speaker or writer has that category in mind for the entire passage;" and (2) "when the tagalong general term is given its broadest application, it renders the prior enumeration superfluous").

*generis* applies equally and instructs readers to "restrict application of the general terms to things that are similar to those enumerated"); *see also Edwards v. United States*, 583 A.2d 661, 664 (D.C. 1990) (discussing *ejusdem generis*).

Because each example of an "extraordinary and compelling reason" for relief articulated by the Council relates to age, illness, or incapacitation, either of the movant or of a family member, the "other reasons" clause must be read as embracing only reasons "similar in nature." *Sivaraman v. Guizzetti & Assocs., Ltd.*, 228 A.3d 1066, 1073-74 (D.C. 2020). Rehabilitation is not similar in nature and thus is not captured by the catch-all.

The majority argues that these canons are inapplicable because there is no ambiguity in the phrase "extraordinary and compelling reasons." *Ante* at 16-18. I disagree. The Council did not explicitly define every possible "other" extraordinary and compelling reason for relief, leaving it to the courts to exercise their discretion in light of the examples it *chose* to define as extraordinary and compelling reasons. And while courts have declined to employ *noscitur a sociis* in situations where the term in question has been "explicitly define[d]," *Bilski v. Kappos*, 561 U.S. 593, 604 (2010), it is commonly applied in situations interpreting statutes "with strong[ ] contextual cues." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226-27 (2008); *see Gutierrez v. Ada*, 528 U.S. 250, 254-58 (2000) (applying the canon to narrow the

relevant phrase, "any election," where it was closely surrounded by six specific references to gubernatorial elections); *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 306-09 (1961) (applying the canon to narrow the term "discoveries" to discoveries of mineral resources where it was contained in a list of three words, all of which applied to the oil, gas, and mining industries and could not conceivably all apply to any other industry). Indeed, a statute with a catch-all provision is the quintessential situation for application of the canons. *See Harrington*, 603 U.S. at 217-18; *Bolz v. District of Columbia*, 149 A.3d 1130, 1139 (D.C. 2016) ("The canon of *ejusdem generis* counsels that the meaning of a catchall term is informed by the list of words preceding it.").

The majority's framing does not seriously contest the fact that the phrase "extraordinary and compelling reasons," "does not stand alone, but gathers meaning from the words around it." *Jarecki*, 367 U.S. at 307. Here, the "surrounding contextual clues" set out in Sections 24-403.04(a)(1), (a)(2), & (a)(3)(B), (C), & (D) support my use of *noscitur a sociis* to interpret the catch-all and actively work against the majority's claim that the phrase instead "permits the consideration of factors as broad as the term itself would suggest." *See Lucas v. United States*, 305 A.3d 774, 778 (D.C. 2023) (citing *Yates v. United States*, 574 U.S. 528, 564 (2015) (Kagan, J., dissenting)).

A similar logic applies with respect to my use of the related canon, *ejusdem generis*. The majority does not appear to contest the fact that "[o]ther extraordinary and compelling reasons, including" is a residual phrase or that it is broad in nature. And where, as here, a broad clause constitutes a residual phrase, it must be controlled by, and defined with reference to, the "enumerated categories" recited around it, so that the clause encompasses only reasons similar in nature. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001); *see also* 2A Norman Singer & Shambie Singer, *Sutherland Statutes and Statutory Construction* § 47.17 (explaining that the canon of *ejusdem generis* instructs readers to "restrict application of the general terms to things that are similar to those enumerated").

In their effort to dispute the obvious throughline in the eligibility portion of the statute, my colleagues in the majority single out two provisions. The majority first asserts that Section 24-403.04(a)(3)(C) ("Death or incapacitation of the family member caregiver of the defendant's children[.]") bears no direct connection to health and welfare concerns that might call for mercy and instead rests on the values of having parents raise their own children and family togetherness. *Ante* at 14-15 & n.2. But, even assuming this provision is not strictly health-related (although I see no reasonable reading of "incapacitation" in this context—paired with "death" and then used in the next subsection in connection with a need for "caregiv[ing]"—as meaning incarceration), it is consistent with the compassion-based nature of the

statute: one whose children are left without a caregiver due to death or incapacitation has suffered a misfortune potentially warranting mercy. *See Fernandez*, 146 S. Ct. at 1304 (observing that "a child left with no guardian," like age and illness, is among the "heartland 'extraordinary and compelling reasons' that might warrant an early release from prison").

Turning its attention next to Section 24-403.04(a)(2), the majority posits that this provision reflects, at least in part, the view that movants who have served decades in prison have often simply aged out of crime by sixty, regardless of any health issues. *Ante* at 15. To bolster their conclusion that compassion considerations were not the driving force behind Section 24-403.04(a)(2), my colleagues contrast that provision with Section 24-403.04(a)(3)(B). The latter provision, they point out, is likewise limited to movants who are at least sixty years old but includes the express requirement that they also suffer from serious medical conditions or comorbidities that leave them acutely vulnerable to COVID-19. *Ante* at 15-16. The omission of similar criteria from Section 24-403.04(a)(2) thus "strongly suggests," in my colleagues' view, that health concerns were not a sole or even primary animating principle behind Section 24-403.04(a)(2). *Ante* at 16.

The majority again reads this provision in isolation, jettisoning critical context. The age threshold is more naturally understood as a proxy for infirmity:

health problems tend to accumulate with age, and for inmates, limited access to consistent and quality medical care likely exacerbates this. Rather than reflecting an assumption that elderly prisoners have aged out of crime—a consideration properly reserved for the dangerousness analysis—the special consideration afforded to older, more fragile inmates nearing the end of their lives in these provisions reflects the entire aim of the statute: compassion. Context reinforces this reading: situated within the "other" reasons catch-all, Section 24-403.04(a)(3)(B) is more naturally read as an *extension* of Section 24-403.04(a)(2), designed to capture inmates who are especially vulnerable to COVID-19 due to their age, but who fall short of the per se age qualification because they have not served at least twenty years in prison.

## B. Legislative History

Conspicuously absent from the majority's opinion is any substantial discussion of the legislative history of the District's compassionate release statute, which bolsters my interpretation of the law.

In response to the ongoing COVID-19 pandemic, the Council passed an emergency resolution that, among other things, authorized Superior Court judges to grant compassionate release to District prisoners who faced serious risk of severe illness or death from COVID-19. D.C. Act 23-286 § 305, 67 D.C. Reg. 4178 (Apr. 10, 2020). In the following months, the Council renewed this authority in emergency

and temporary legislation.[9] At the end of December 2020, the Council passed permanent legislation that largely tracked the emergency and temporary legislation and conferred compassionate release authority on Superior Court judges.[10]

In the report addressing the bill to make permanent what had been emergency and temporary legislation, the Committee on the Judiciary and Public Safety explained in more detail the context and purpose of the compassionate release statute. *See* Committee Report at 24-29. Citing the staggering impact of COVID-19 on incarcerated individuals (and correctional staff), the Committee recognized that, while most jurisdictions "across the country at the local, county, and state levels" had already implemented "a variety of COVID-responsive measures to release individuals in their custody, consistent with public safety," the District's Department of Corrections initially struggled to contain the virus and protect prisoners and staff. *Id.* at 24-25. Against this backdrop and in recognition of the fact that the District's "lack of statehood and autonomy over its criminal justice system" limited its options to legislatively reduce prison populations, the Council worked with advocates and

---

[9] *See* D.C. Act 23-326 § 706, 67 D.C. Reg. 7045 (May 27, 2020); D.C. Act 23-328 § 706, 67 D.C. Reg. 7598 (June 8, 2020); D.C. Act 23-405 § 706, 67 D.C. Reg. 10235 (Aug. 19, 2020); D.C. Law 23-130 § 706, 67 D.C. Reg. 8622 (Oct. 9, 2020); D.C. Act 24-30 § 706, 68 D.C. Reg. 3101 (Mar. 17, 2021).

[10] *Compare* D.C. Act 23-286 § 305, 67 D.C. Reg. 4178 (Apr. 10, 2020), *with* D.C. Law 23-274 § 1203, 68 D.C. Reg. 1034 (Apr. 27, 2021).

community members to "creatively approach[ ] the COVID-19 crisis locally." *Id.* at 26. These efforts included expanding how good time credits could be accrued and applied and creating a local compassionate release statute. *Id.* at 26-27.

The local statute was created "in the image of the federal statute," but it also "diverges in certain respects appropriate to the District." *Id.* at 27. Turning first to the parallels with the federal statute, each enumerated eligibility provision of Section 24-403.04(a) has a federal counterpart. Paragraph (1) of Section 24-403.04(a), concerning terminal illness, mirrors Guidelines § 1B1.13 cmt. n.1(A)(i). Paragraph (2), conferring eligibility based on age and time served, is similar to 18 U.S.C. § 3582(c)(1)(A)(ii). Subparagraphs (A) and (B) of Section 24-403.04(a)(3), which concern serious medical conditions and elderly age, are corollaries to Guidelines § 1B1.13 cmt. n.1(A)(ii) and (B). And subparagraphs (C) and (D), relating to family circumstances, track Guidelines § 1B1.13 cmt. n.1(C)(i) and (ii). Both schemes also allow for compassionate release based on *un*enumerated extraordinary and compelling reasons via a catch-all provision; the District's scheme by providing that the list of extraordinary and compelling reasons is nonexhaustive, *see Autrey*, 264 A.3d at 656, and the federal scheme by expressly allowing for "an extraordinary and compelling reason other than, or in combination with," the enumerated reasons, *see* U.S. Sent'g Guidelines Manual § 1B1.13 cmt. n.1(D).

Where Section 24-403.04 departs from its federal predecessor is critical when interpreting the scope of the catch-all. The critical point of divergence between the two statutory schemes is the respective contexts in which they were enacted, *see United States v. Hansen*, 599 U.S. 762, 775 (2023) ("Statutory history is an important part of [a statute's] context."), and crucial here is the central importance of the COVID-19 pandemic to the District's compassionate release statute. The initial emergency legislation offers the most succinct and clear statement of the pervasive influence of the pandemic: the Council explained that, "[t]o protect the health and safety of individuals who are in the criminal justice system, it is necessary to . . . align the use of compassionate release with the federal First Step Act of 2018 . . . *for certain elderly defendants and defendants with chronic conditions*." COVID-19 Response Supplemental Emergency Declaration Resolution of 2020, D.C. Res. 23-399 § 2(f) (Apr. 7, 2020) (emphasis added). These emergency measures were ultimately made permanent with, according to the Committee report, only "minor changes," suggesting that the statute was purposefully left undisturbed and cabined to its original pandemic-based, public-health-centered context. Committee Report at 24.

Our compassionate release cases support my view of the legislative history. The cases speak of eligibility exclusively in terms of age and illness, even when they are explaining that the catch-all provision is expansive and flexible. *See Stringer*,

317 A.3d at 877 ("Despite the terms of Section 24-403.04(a)(3)(B)(iii), 'trial courts have generally concluded that under the catch-all provision, a D.C. prisoner can demonstrate eligibility for compassionate release by showing that they are at risk for severe illness from COVID-19, regardless of age or time served.'" (citation modified)); *Colbert*, 310 A.3d at 613 ("[V]accinated or not, eligibility depends on an individualized assessment of the person's risk factors."); *Page v. United States*, 254 A.3d 1129, 1130 (D.C. 2021) (stating that trial courts have discretion to "consider any reasonable factor that directly impacts on the determination of whether an applicant is 'at risk of severe illness or death from COVID-19'").

In *Autrey*, we elaborated on our conclusion in *Page* "that the Council intended for the catch-all to afford trial courts the 'discretion to review the compelling facts of a case' rather than bind them with rigid criteria amid an unprecedented and often unpredictable pandemic." 264 A.3d at 656 (quoting *Page*, 254 A.3d at 1130). Important to our analysis was the fact that even though the Council was aware of how the District's judges had been extending the catch-all to prisoners whose "circumstances increase[d] their vulnerability to death or severe illness from COVID-19 . . . even if they do not meet the definition of 'elderly' based on their age or length of imprisonment," it nonetheless "did not amend the statute with different or additional examples warranting relief based on COVID-19." *Id.* We therefore concluded that the "Council's decisions to (1) keep the number of enumerated

examples limited, (2) retain a nonexhaustive catch-all provision, (3) leave operative terms undefined, and (4) express approval of trial court judges extending the catch-all beyond the elderly age criteria despite the imminent availability of vaccines, collectively reinforce the conclusion that the Council intended for the catch-all's other extraordinary and compelling reasons standard to *remain flexible in the face of changing circumstances* and *evolving scientific knowledge*." *Id.* (emphases added) (citation modified).

Put another way, in keeping with its stated purpose of ensuring public health and safety by reducing the District's prison populations to slow the spread of COVID-19, the Council left the catch-all unaltered to avoid foreclosing relief to movants it may not have anticipated, given the inherent uncertainty of the COVID-19 pandemic. Highlighting the need for a "flexible" response "to the ever-changing realities on the ground," we held in *Autrey* that courts, in applying the catch-all provision, are required to "consider 'any reasonable factor,' not just vaccination, in determining whether a prisoner has shown 'an extraordinary and compelling' reason warranting a sentence modification." *Id.* at 657-58 (citation modified) (quoting *Page*, 254 A.3d at 1130). Those factors may include evidence regarding vaccine efficacy, emerging research on "long COVID," the availability of booster shots when needed to "prevent severe illness or death due to waning immunity," and the rise of new virus variants "to the extent they impair the efficacy

of the existing vaccines in preventing severe illness or death." *Id.* at 658. To be sure, we focused in our prior cases on COVID-19 and health-related factors because those were the factors at issue. The cases nonetheless reflect an understanding that the District's compassionate release statute, borne of the pandemic, contemplates eligibility for relief turning on considerations of age, health, and welfare, all conditions or circumstances that might call for mercy.[11]

The majority's only basis for disregarding the District statute's pandemic origins is the resemblance our statute bears to the federal compassionate release law. From the premise that the District's statute was created "in the image of the federal

---

[11] The dissenting opinion in *Page* also is informative. Concerned that the majority opinion was artificially narrowing the catch-all by crafting a requirement that prisoners "show that they are likely to be infected with COVID-19," the dissenting opinion framed the statute as being concerned not with the likelihood of infection but with "the *consequence* of infection—specifically, the possibility that individuals serving terms of imprisonment would inadvertently suffer a harsher punishment of severe illness or even death because of their vulnerability to the disease." 254 A.3d at 1132 (Easterly, J., dissenting). With respect to the statute's applicability, the dissent emphasized that "the legislative history makes it pellucidly clear that the Council, in drafting this statute, operated from the premise that it is beyond doubt and could hardly be overstated that individuals in jails and prisons are particularly vulnerable during this pandemic[.]" *Id.* at 1134 (citation modified). The Council, according to the dissent, "made *vulnerability to the consequences of infection with COVID-19* its *exclusive concern.*" *Id.* at 1135 (emphases added). Thus, the dissenting opinion concluded that the legislative history "reveals that the Council foresaw that prisons would be petri dishes for COVID-19 and enacted the permanent compassionate release legislation based on that confirmed premise[.]" *Id.* at 1136.

statute," the majority appears to conclude that near-perfect alignment between the two schemes is required.[12] This conclusion does not withstand scrutiny. The Council made clear that the District's compassionate release statute "*diverges* in certain respects appropriate to the District." Committee Report at 27 (emphasis added). Far from incidental, these divergences reflect the Council's deliberate tailoring of compassionate release to the public health crisis the District was facing.

Setting this aside, even accepting the majority's premise that our interpretation of the District's compassionate release statute should align with the federal scheme, the majority's expansive reading of "extraordinary and compelling reasons" is at odds with the Supreme Court's recent case law. In *Rutherford*, the Court held that a sentencing disparity resulting from Congress's decision to leave a

---

[12] The majority relies heavily on *Bailey* for the proposition that we should consider the federal statutory scheme "highly persuasive." *Ante* at 20-21, 30-31. This reliance is misplaced. In *Bailey*, we looked to the federal statutory scheme for guidance in answering the question of "who bears the burden on whether a prisoner is non-dangerous and what, precisely, that burden is." 251 A.3d at 728. Looking to how federal courts addressed this issue within the federal scheme, we determined that they have uniformly "held that the preponderance standard applies." *Id.* at 729. Because the District's statute is modeled after the federal one, and "is intended to 'align' with the use of federal compassionate release," the guidance of federal courts was highly persuasive. *Id.* at 729-30. In *Bailey*, however, we had no choice but to look to the federal statute for guidance because the District's statute was "silent" on these points. *Id.* at 728. Section 24-403.04 is not similarly silent with respect to what amounts to an extraordinary and compelling reason for relief, obviating the need to import an answer from the federal scheme.

sentence untouched cannot serve as an "extraordinary and compelling reason[ ]" warranting a sentence reduction. 146 S. Ct. at 1335. The "heartland of compassionate release" is defined by an inmate's personal circumstances, namely those "particularly meritorious or unusual circumstances" that warrant early release, like terminal or severe illness or "extraordinary change[s] in an inmate's personal or family situation." *Id.* at 1331 (citation modified). The Court cautioned that "[w]hile the terms 'extraordinary' and 'compelling' leave room for judgment, they are not so flexible as to encompass any consideration." *Id.* at 1332.

And in *Fernandez v. United States*, the Court similarly held that "doubts about a conviction's validity" could not qualify as an extraordinary and compelling reason for relief. 146 S. Ct. at 1298. Because the statute is concerned with "granting mercy rather than righting legal wrongs," the Court reasoned, the heartland "extraordinary and compelling reasons" potentially warranting early release—"age, illness, a child left with no guardian"—are rooted in an inmate's personal circumstances, not the validity of a conviction. *Id.* at 1303-04. The Court reiterated that although Congress "has not defined the 'extraordinary and compelling reasons' that may warrant a reduced sentence, these criteria are not empty vessels" and constitute a "demanding standard." *Id.* at 1302.

In both cases the Court explicitly rejected my colleagues' argument that "other reasons" for release need not be "similar in nature and consequence" to the listed examples of "extraordinary and compelling reasons" so long as they are similar "in gravity." *Ante* at 27 (quoting U.S. Sent'g Guidelines Manual app. C, amend. 814 (effective Nov. 1, 2023)). *Compare Fernandez*, 146 S. Ct. at 1302-04 (explaining that a movant's proposed "extraordinary and compelling reasons" should be in accordance with the statute's "theme of 'compassion'" and tied to an inmate's personal circumstances, citing "advanced age, safety risk, illness, rehabilitation, and the like" as quintessential examples), *with id.* at 1315 (Jackson, J., dissenting) ("The takeaway from all this is not, as the majority suggests, that compassionate release has always been understood to be limited to certain *kinds* of factors (*i.e.*, personal circumstances). Rather, the statutory and regulatory history establishes that § 3582(c)(1)(A) provides for flexibility and, with one exception, imposes no substantive categorical restrictions on what may constitute a basis for compassionate release.") (internal citations omitted) (emphasis in original)); *compare Rutherford*, 146 S. Ct. at 1331-32 (explaining that a movant's proffered "extraordinary and compelling reasons" must be "especially unusual and convincing" and resemble those that have defined the "heartland of compassionate release"), *with id.* at 1338 (Sotomayor, J., dissenting) ("[W]hether a given set of reasons is 'extraordinary and

compelling' as applied to a particular defendant's case is a question of degree, not of kind.").[13]

### III. Conclusion

The D.C. Council could have enacted a general early release statute for rehabilitated prisoners, but it did not. Instead, pointing specifically to COVID-19, it enacted a statute that has eligibility for a sentence modification turn on listed factors that, while nonexhaustive, all reflect the legislation's focus on health, infirmity, and welfare—factors that involve unusual distressing circumstances and call for mercy. In my view, the statutory text and structure and the legislative history compel the conclusion that rehabilitation is relevant to dangerousness, not eligibility. Because the majority holds otherwise, I respectfully dissent.

---

[13] In arguing that *Fernandez*'s observation that rehabilitation is a "relevant consideration in granting compassionate release" under the federal scheme, 146 S. Ct. at 1303, "settles the point" in the majority's favor, *ante* at 32, the majority again ignores the fundamental distinction between the federal and District statutes. Expressly citing 28 U.S.C. § 994(t), *Fernandez* was simply noting that "Congress has permitted the Sentencing Commission to treat a defendant's rehabilitation as a relevant consideration in granting compassionate release." 146 S. Ct. at 1303. As we have noted, Section 994(t) suggests that rehabilitation can be an extraordinary and compelling reason, although it cannot be sufficient on its own. 28 U.S.C. § 994(t). The District's statute, by contrast, expressly places rehabilitation in the dangerousness analysis and does not indicate that it is relevant to eligibility, whether by itself or in combination with other factors.